IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| 10x GENOMICS, INC. and ROCHE SEQUENCING SOLUTIONS, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. |
| ILLUMINA, INC., | ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) | |

## COMPLAINT

Plaintiffs 10x Genomics, Inc. ("10x") and Roche Sequencing Solutions, Inc. ("RSS") in their Complaint for patent infringement against Defendant Illumina, Inc. ("Illumina") allege as follows:

## NATURE OF THE ACTION

1.      This is an action for infringement of RSS's U.S. Patent Nos. 11,692,214 (the "214 Patent") and 11,932,902 (the "902 Patent") (collectively, the "Nolan Patents") and 10x's U.S. Patent Nos. 12,275,993 (the "993 Patent"), 12,305,239 (the "239 Patent") and 12,416,102 (the "102 Patent") (collectively, the "10x Patents"). These five patents are collectively referred to as the "Asserted Patents." This action arises under the patent laws of the United States, Title 35, United States Code, including 35 U.S.C. § 271.

## THE PARTIES

2.      10x is a Delaware corporation. Its principal place of business is 6230 Stoneridge Mall Road, Pleasanton, CA 94588. 10x is the assignee of the 10x Patents and the exclusive licensee of the Nolan Patents.

1

3.      10x is a pioneering innovator of genomics and sequencing technologies that are providing life science researchers and clinicians an unprecedented understanding of biology. By elegantly combining its proprietary hardware, chemistry, and software, 10x has developed and brought to market award-winning products that give single-cell and spatial views of complex biological systems. 10x's products have enabled previously infeasible forms of research in the life sciences in areas of critical importance to human health, including cancer research, neuroscience, immunology, infectious disease, and developmental biology.

4.      RSS is a Delaware corporation with its principal place of business at 4300 Hacienda Drive, Pleasanton, California 94588.

5.      On information and belief, Illumina is a company organized and existing under the laws of the State of Delaware. On information and belief, its principal place of business is in San Diego, California.

6.      On information and belief, Illumina makes, uses, sells, offers to sell, exports, and/or imports in the United States products, services, and components that have been and are used to infringe one or more claims of the Asserted Patents, actively induces infringement by others of the Asserted Patents, and contributes to the infringement by others of the Asserted Patents.

## JURISDICTION AND VENUE

7.      Plaintiffs incorporate the foregoing paragraphs of the Complaint by reference as if fully set forth herein.

8.      This civil action for patent infringement arises under the patent laws of the United States, 35 U.S.C § 1 *et seq.*, including 35 U.S.C. § 271. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

9.      This Court has personal jurisdiction over Illumina, and venue is proper in this district pursuant to 28 U.S.C. § 1400(b), because Illumina is a Delaware corporation and thus resides in this district.

## BACKGROUND

### A.      10x's Groundbreaking Technology

10.      10x is a life sciences technology company founded in 2012 in Pleasanton, California by Drs. Serge Saxonov and Benjamin Hindson. Since its inception, 10x has focused on building new technologies to enable breakthrough discoveries and accelerate the understanding of biology. To date, 10x has invested hundreds of thousands of hours and approximately $2 billion in research and development to invent, design, and develop its proprietary line of products for understanding biology at unprecedented resolution and scale. 10x continues to invest significant time and money to further innovate and bring groundbreaking new products and capabilities to market.

11.      10x's award-winning Chromium platform has been revolutionary in enabling single cell genomics—the study of gene activity on a cell-by-cell basis. The genetic code contained in a person's DNA inside the nucleus of each cell is transcribed into a nucleic acid called messenger RNA (mRNA), which is then in turn translated into the proteins that implement the cell's biological functions. The full range of mRNA expressed in a cell is known as its "transcriptome." A cell's transcriptome can provide insight into how it is differentiated from other cells and whether it may be cancerous or otherwise disordered. The study of cellular transcriptomes is known as transcriptomics. In contrast to prior techniques, in which genetic material from biological tissue was blended and analyzed in bulk, cell-by-cell analysis preserves the heterogeneity of cells and their transcriptomes within larger biological samples. For example, a cancer tumor can consist of a varied population of cells, some healthy and some cancerous, and

the cancerous cells themselves may consist of genetically distinct subpopulations that are susceptible to different therapeutics. Prior techniques for sequencing the genomic make-up of a sample did not preserve this type of complexity, but that complexity can be fully captured using 10x's single-cell analysis solutions such as the Chromium platform. The Chromium X, which launched in July 2021, enables the expansion of single-cell studies to experiments on the scale of a million cells and was named a Top 10 Innovation in 2021 by *The Scientist* magazine.

12.     In the ten years since its first product launch in 2015, 10x's expanding suite of products has fueled a revolution in genomics, winning wide acclaim and commercial success. 10x has achieved an installed base of more than 7,000 instruments around the world, including at all the top 100 global research institutions and all the top 20 global biopharmaceutical companies. Annual sales of 10x products exceeded $600 million in 2024. Over 10,000 scientific articles have been published based on data generated from 10x products, including hundreds of articles in top journals *Cell*, *Science*, and *Nature*. This scientific work illustrates the use of 10x products to discover, for example: molecular mechanisms that lead to brain, breast, and lung cancers; how the immune system reacts to COVID-19 infections; and a new type of lung cell that causes cystic fibrosis. The paradigm-changing nature of 10x's products has led to numerous accolades, including these products being named to *The Scientist* magazine's Top 10 Innovations List in 2015, 2017, 2018, 2019, 2020, and 2021.

## B.    RSS's Pioneering Single-Cell Sequencing Technology

13.     RSS is a branch of the diagnostics division of the Roche group. Roche has grown into the world's largest biotechnology company and the global leader in *in-vitro* diagnostics. The

company pursues scientific excellence to discover and develop medicines and diagnostics for improving and saving the lives of people around the world. Roche is a pioneer in personalized healthcare and wants to further transform how healthcare is delivered to have an even greater impact. To provide the best care for each person, Roche partners with many stakeholders and combines its strengths in Diagnostics and Pharma with data insights from the clinical practice. RSS has been committed to providing next-generation sequencing library prep solutions and application support for sequencing for several years. Today, next-generation sequencing solutions from RSS play an important role in the sequencing ecosystem.

### C.    Illumina's Infringing Single-Cell Kits and Workflow

14.    On    July    9,    2024,    Illumina    acquired    Fluent    BioSciences. https://investor.illumina.com/news/press-release-details/2024/Illumina-acquires-Fluent-BioSciences-to-accelerate-single-cell-analysis-and-discovery-to-a-broader-customer-base/default.aspx (last accessed October 16, 2025). Fluent BioSciences began marketing its single-cell technology as of at least March 2023. *See* https://www.fluentbio.com/fluent-biosciences-announces-nature-biotechnology-journal-publication/.    The    Fluent    BioSciences    webpage, https://www.fluentbio.com (last accessed October 16, 2025), now describes Fluent BioSciences as an Illumina company, and its User Guides are now identified with Illumina. *See, e.g.*, "Illumina Single Cell 3' RNA Prep T2 User Guide," Doc ID: FB0005260, Revision 1.6, dated December 2024, available at https://www.fluentbio.com/wp-content/uploads/2024/05/Illumina-Single-Cell-3-RNA-Prep-T2-User-Guide-.pdf    ("Illumina    T2    User    Guide    (Rev.    1.6)"); https://www.fluentbio.com/resources/ (last accessed October 16, 2025). Illumina now provides a training packet, a data sheet, and product documentation that includes sample preparation and protocols for its Single Cell 3' RNA Prep. *See* "Illumina Single Cell 3' RNA Prep Training Packet,"

Doc # 2000065159 v01, available at https://support.illumina.com/content/dam/illumina-support/courses/illumina-single-cell-3-rna-prep-training-packet/illumina-single-cell-3-rna-prep-training-packet-200065159-00-1.pdf (last accessed October 16, 2025) ("Illumina Training Packet"); "Illumina Single Cell 3' RNA Prep data sheet," M-GL-03195 v1.0, available at https://www.illumina.com/content/dam/illumina/gcs/assembled-assets/marketing-literature/iillumina-single-cell-rna-prep-data-sheet-m-gl-03195/illumina-sc-rna-prep-data-sheet-m-gl-03195.pdf (last accessed October 16, 2025) ("Illumina Data Sheet"); https://support.illumina.com/sequencing/sequencing_kits/illumina-single-cell-prep/documentation.html ("Illumina Protocols"); *see, e.g.*, "Illumina Single Cell 3' RNA Prep, T2 Product Documentation," document # 200063178 v01, dated August 2025, available at https://support-docs.illumina.com/LP/PIPseqT2/200063178_01_illumina-single-cell-rna-t2.pdf ("Illumina Single Cell T2 Product Documentation"); https://support-docs.illumina.com/LP/PIPseqT100/200063184_01-illumina-single-cell-rna-t100.pdf ("Illumina Single Cell 3′ RNA Prep, T100 Protocol").

15.    In 2023, Fluent announced that Fluent researchers, led by Iain Clark, had published an article describing the PIPseq technology. *See* https://www.fluentbio.com/fluent-biosciences-announces-nature-biotechnology-journal-publication/ (last accessed October 16, 2025); "Microfluidics-free single-cell genomics with templated emulsification," Iain C. Clark *et al.*, 1(11) NAT. BIOTECH. 1557 (2023), doi:10.1038/s41587-023-01685-z, available at https://www.nature.com/articles/s41587-023-01685-z ("Clark"). The workflow called "PIPseq V" then followed, which purportedly was "a significant improvement to the previously released PIPseq v4.0PLUS chemistry and workflow." *See* "Intrinsic molecular identifiers enable robust molecular counting in single-cell sequencing," Kristina M. Fontanez *et al.*, (preprint available at

https://www.biorxiv.org/content/10.1101/2024.10.04.616561v1    ("Fontanez")    at    4.    On information and belief, Fluent commercialized its PIPseq V 3' Single Cell RNA Kit (now Illumina's Single Cell 3' RNA Prep Kit) based on the chemistry and workflow described in Fontanez as PIPseq V.

16.      Illumina's Single Cell 3' RNA Prep kits attempt to provide a "high-resolution view of complex tissues" by pairing "single-cell capture and barcoding with next-generation sequencing (NGS)." Illumina Data Sheet at 2. An Illumina Kit purportedly "enables single-cell mRNA capture, barcoding, and library prep without complex workflows or microfluidics," to provide "an easy and scalable workflow." Illumina Data Sheet at 2. Illumina Single Cell 3' RNA Prep uses PIPseq chemistry whereby particle-templated instant partitions (PIPs) use emulsification with template particles that include barcoded oligonucleotides bound to hydrogel beads. The barcoded oligonucleotide includes a PCR handle, cell barcodes for identifying the PIP, a 3-base binning index, a fixed spacer sequence, and a poly(dT)V capture site for 3' capture of mRNA. Cells of interest are captured in PIPs and lysis reagents that are in a separate emulsion are transferred via micellar transport to the cell droplets. The cells are lysed releasing mRNA that is captured on the poly(dT) sequence attached to the bead. Reverse transcription is performed to generate cDNA followed by library preparation and sequencing. *See* Illumina Data Sheet at 3 (Figure 2) shown below:



17.     The barcoded beads used in the Illumina workflow and that are provided in the Illumina Single Cell 3' RNA kits are synthesized using a split-pooling method previously described. *See, e.g.*, Clark; "Modular barcode beads for microfluidic single cell genomics," Cyrille L. Delley & Adam R. Abate, 11 SCI REP 10857 (2021), available at https://www.nature.com/articles/s41598-021-90255-x ("Delley"); and Supplemental Data to "Modular barcode beads for microfluidic single cell genomics," Cyrille L. Delley & Adam R. Abate, 11 SCI REP 10857 (2021), available at https://static-content.springer.com/esm/art%3A10.1038%2Fs41598-021-90255-x/MediaObjects/41598_2021_90255_MOESM2_ESM.pdf ("Delley Supp. Data"). The barcoded oligonucleotide includes a PCR handle, cell barcodes for identifying the PIP, a 3-base binning index, a fixed spacer sequence, and a poly(dT)V capture site for 3' capture of mRNA. The split-pooling method involves suspending beads in each well of a 96-well plate containing a unique barcode; attaching the unique barcode, pooling the beads from the 96 wells and repeating the steps to add four (4) barcode sequences where the barcode set grows exponentially with each cycle.

18.     Data analysis can be performed using DRAGEN. *See* "DRAGEN Illumina PIPseq scRNA Product Guide," available at https://help.dragen.illumina.com/product-guide/dragen-v4.4/dragen-single-cell-pipeline/dragen-scrna-pipseq (last accessed October 16, 2025) ("DRAGEN Single Cell Pipeline"). The webpage shows that Illumina is still using split-pool barcoding. For example, it states: "The PIPseq platform uses a tiered barcode system, where every one of four tiers includes one of a specified list of possible barcodes." Likewise, the "Default Value in PIPseq Mode" is "0_7+11_16+20_25+31_38," indicating that there are four separate barcode segments (of 8, 6, 6, and 8 bases).

19.     The "Accused Instrumentalities" are all products, components, and services that are made, used, performed, offered for sale, sold, and/or imported into the United States by or on behalf of Illumina (including formerly Fluent) in connection with the Illumina Single Cell 3' RNA Kits (previously marketed by Fluent as Fluent PIPseq V 3' Single Cell RNA Kits). The Accused Instrumentalities include for example and without limitation, the Illumina Single Cell 3' RNA Prep T2 Kit; Illumina Single Cell 3' RNA Capture, T2 Kit; the Illumina Single Cell 3' RNA Prep T10 Kit, Illumina Single Cell 3' RNA Capture, T10 Kit; the Illumina Single Cell 3' RNA Prep T20 Kit, Illumina Single Cell 3' RNA Capture, T20 Kit; the Illumina Single Cell 3' RNA Prep T100 Kit, Illumina Single Cell 3' RNA Capture, T100 Kit; the Illumina Single Cell Library Prep Kit; the Illumina Single Cell Unique Dual Indexes; Illumina Single Cell Prep Starter Equipment, and all products, components, accessories, reagents, and services provided by Illumina in connection with the Illumina Single Cell 3' RNA Kits (*see* https://www.illumina.com/products/by-type/sequencing-kits/library-prep-kits/single-cell-rna-prep.html#tabs-7e15f73ee5-item-e0246ebfcd-order); PIPseq V T2 3' Single Cell RNA Kit Bundle; PIPseq V T2 3' Capture & Barcoding Kit; PIPseq V T10 3' Single Cell RNA Kit Bundle; PIPseq V T10 3' Capture &

Barcoding Kit; PIPseq V T20 3' Single Cell RNA Kit Bundle; PIPseq V T20 3' Capture &

Barcoding Kit; PIPseq V T100 3' Single Cell RNA Kit Bundle, PIPseq V T100 3' Capture &

Barcoding Kit; and PIPseq V Library Prep Kit.

    **D.**    **The Patents In Suit**

        **1.**    **The Nolan Patents**

20.    The inventor of the Nolan Patents is Garry Nolan. The Nolan Patents are titled

"Barcoded beads and method for making the same by split-pool synthesis," are assigned to RSS,

and are exclusively licensed to 10x.

21.    The 214 Patent issued on July 4, 2023, and is attached as **Exhibit 1**. The 214 Patent

issued from U.S. Patent application No. 18/086,383, filed on Dec. 21, 2022, which is a continuation

of U.S. Patent application No. 17/951,003, filed on Sep. 22, 2022, which is a continuation of U.S.

Patent application No. 17/870,641, filed on July 21, 2022, which is a continuation of U.S. Patent

application No. 16/795,203 (the "203 application"), filed on Feb. 19, 2020, which is a continuation

of U.S. Patent application No. 16/147,250, filed on Sep. 28, 2018, which is a continuation of U.S.

Patent application No. 13/981,711, filed on Apr. 15, 2016, which is a § 371 national phase of

International Patent application No. PCT/US2012/023411, filed on Jan. 31, 2012, which claims

priority to US provisional Patent application Nos. 61/437,854 filed on Jan. 31, 2011 and

61/444,067 filed on Feb. 17, 2011.

22.    The 902 Patent issued on March 19, 2024, and is attached as **Exhibit 2**. The 902

Patent issued from U.S. Patent application No. 18/233,214, filed on Aug. 11, 2023, which is a

continuation of U.S. Patent application No. 18/134,003, filed on Apr. 12, 2023, which is a

continuation of U.S. Patent application No. 18/086,369, filed on Dec. 21, 2022, which is a

continuation of U.S. Patent application No. 17/951,013, filed on Sep. 22, 2022, which is a

continuation of U.S. Patent application No. 17/870,697, filed on July 21, 2022, which is a continuation of the 203 application described above.

a.    **The 214 Patent**

23.    Claims 1 and 11 are the only independent claims of the 214 Patent. They recite:

1. A population of beads, comprising:

 (a) a first bead associated with a first nucleic acid tag that comprises:

  (i) a first cell origination barcode; and

  (ii) a degenerate sequence; and

 (b) a second bead associated with a second nucleic acid tag that comprises:

  (i) a second cell origination barcode, and

  (ii) a degenerate sequence;

wherein the first and second cell origination barcodes are different.

11. A method for making a population of barcoded beads, comprising:

 adding nucleic acid tags that comprise a cell origination barcode and a
 degenerate sequence onto beads by a split-pool barcoding process.

24.    Claim 1 of the 214 Patent is directed to a specific, tangible composition of matter, namely beads with an origination barcode and a degenerate sequence. Claim 11 is directed to a concrete manufacturing and assay process for producing barcoded beads, namely ones generated by a split-pool barcoding process. The resulting barcoded beads do not exist in nature.

25.    The claimed technology is not routine or conventional. As the 214 Patent explains, the approaches that existed before were insufficient: "The methods available to date still require significant amounts of biological samples or will not provide cell specific information. Additionally, there are limited methods of multiplexed protein measurement technologies due to the additional challenges inherent in protein samples." 214 Patent 1:47–52. The solution provides a method for simultaneously determining (i) the identity of the bound target and (ii) the unique

cell from which that target originated, which allows users "to qualitatively determine gene expression and specific variants of whole proteins . . . ." 214 Patent 1:40–45. This is accomplished through a split-pool barcoding process and through the combination of a cell origination barcode with a degenerate sequence—an unconventional approach. The written description of the 214 Patent describes, in technical detail, each of the limitations in the claims, allowing a person of skill in the art to understand what those limitations cover, and therefore what was claimed. The claimed combinations were not well-understood, routine, or conventional to one of ordinary skill in the art at the time of the invention. The composition methods covered by the claims of the 214 Patent, therefore, differ markedly from the prior systems in use at the time of this invention, which, *inter alia*, lacked these features.

26.     The beads recited in the 214 Patent's claims are embodied in 10x's Chromium products.

27.     Dependent claims of the 214 Patent are further directed to specific, unconventional improvements to single-cell analysis. These additional unconventional combinations include, for example, the size of the population of beads (claims 2, 3), using multiple rounds of split-pool barcoding (claims 12), and specific choices for the beads (claims 5, 6, 23, 24).

### b.    The 902 Patent

28.     Claims 1, 17, and 23 are the only independent claims of the 902 Patent. They recite:

1. A method for adding cell origination barcodes onto beads, comprising:

(a) splitting a pool of beads into a plurality of reaction volumes;

(b) appending pre-made oligonucleotides onto the beads in the plurality of reaction volumes, wherein at least some of the plurality of reaction volumes each receive a pre-made oligonucleotide that contains a sequence that is different from the other pre-made oligonucleotides added to the plurality of reaction volumes;

(c) pooling the beads; and

(d) repeating steps (a)-(c) one or more times to produce a pool of beads that comprise the cell origination barcodes,

wherein in step (d) the oligonucleotides that are appended in the one or more repeats of step (b) are added to previously appended oligonucleotides to form the cell origination barcodes.

17. A method comprising adding cell origination barcodes onto beads by a split-pool process, wherein the split-pool process comprises multiple rounds of the following steps, performed in order:

(i) splitting the beads;

(ii) adding pre-made oligonucleotides to nucleic acids on the beads while beads are split; and

(iii) pooling the beads

wherein the appended pre-made oligonucleotides become part of a cell origination barcode.

23. A population of beads, comprising:

(a) a first bead associated with a first nucleic acid, wherein the first nucleic acid comprises a first cell origination barcode that comprises a first plurality of ordered oligonucleotides; and

(b) a second bead associated with a second nucleic acid, wherein the second nucleic acid comprises a second cell origination barcode that comprises a second plurality of ordered oligonucleotides;

wherein the sequences of the first and second cell origination barcodes are different.

29.    Claims 1 and 17 of the 902 Patent are directed to concrete manufacturing and assay processes for producing barcoded beads, namely ones generated by iterative split-pool synthesis. Claim 23 is directed to a specific, tangible composition of matter, namely beads with an origination barcode and a degenerate sequence. These barcoded beads do not exist in nature.

30.    The claimed technology is not routine or conventional. As the 902 Patent explains, the approaches that existed before were insufficient: "The methods available to date still require significant amounts of biological samples or will not provide cell specific information.

13

Additionally, there are limited methods of multiplexed protein measurement technologies due to the additional challenges inherent in protein samples." 902 Patent 1:51–56. The solution provides a method for simultaneously determining (i) the identity of the bound target and (ii) the unique cell from which that target originated, which allows users "to qualitatively determine gene expression and specific variants of whole proteins . . . ." 902 Patent 1:44–49. The 902 Patent solves this challenge by, for example:

> splitting a pool of beads into a plurality of reaction volumes, appending pre-made oligonucleotides onto the beads in the reaction volumes, wherein at least some of the reaction volumes each receive an oligonucleotide that contains a sequence that is different from the other oligonucleotides added to the reaction volumes, pooling the beads and repeating the splitting, appending and pooling steps one or more times to produce a pool of beads that comprise the cell origination barcodes.

*Id.* at Abstract. Neither the split-pool barcoding process nor the combination of a cell origination barcode with a degenerate sequence was conventional. The written description of the 902 Patent describes, in technical detail, each of the limitations in the claims, allowing a person of skill in the art to understand what those limitations cover, and therefore what was claimed. The claimed combinations were not well-understood, routine, or conventional to one of ordinary skill in the art at the time of the invention. The compositions and methods covered by the claims of the 902 Patent, therefore, differ markedly from the prior systems in use at the time of this invention, which, *inter alia*, lacked these features.

31.    The beads recited in the 902 Patent's claims are embodied in 10x's Chromium products.

32.    Dependent claims of the 902 Patent are further directed to specific, unconventional improvements to single-cell analysis. These additional unconventional combinations include, for example, using multiple rounds of split-pool barcoding (claims 2-4) and specific choices for the beads (claims 11, 28, 29).

### 2. The 10x Patents

33.    The 993 Patent issued on April 15, 2025, and is attached as **Exhibit 3**. The 993 Patent issued from U.S. Patent application No. 18/929,514, filed on October 28, 2024, which is a continuation-in-part of U.S. application No. 17/397,775 (the "775 application"), filed August 9, 2021, which is a continuation of PCT/US2020/017785, filed February 11, 2020, and published as WO 2020/167862 (the "862 publication"), which claims the benefit of U.S. Provisional Patent Application No. 62/934,256, filed November 12, 2019, and U.S. Provisional Patent Application No. 62/804,633, filed February 12, 2019. The 993 Patent is entitled, "Analysis of nucleic acid sequences," and Solongo B. Ziraldo, Geoffrey McDermott, and Shea Thompson Lance are the named inventors on the 993 Patent.

34.    The 239 Patent issued on May 20, 2025, and is attached as **Exhibit 4**. The 239 Patent issued from U.S. Patent application No. 18/951,533, filed on November 18, 2024, which is also a continuation-in-part of the 775 application, discussed above. The 239 Patent is entitled, "Analysis of nucleic acid sequences," and Solongo B. Ziraldo, Geoffrey McDermott, and Shea Thompson Lance are the named inventors on the 239 Patent.

35.    The 102 Patent issued on September 16, 2025, and is attached as **Exhibit 5**. The 102 Patent issued from U.S. Patent application No. 17/397,775, filed on August 9, 2021, which is a continuation of PCT/US2020/017785, discussed above. The 102 Patent is entitled, "Systems and methods for transfer of reagents between droplets," and Solongo B. Ziraldo, Geoffrey McDermott, and Shea Thompson Lance are the named inventors on the 102 Patent.

#### a. The 993 Patent

36.    Claims 1 and 25 are the only independent claims of the 993 Patent. They recite:

1. A method comprising:

   (a) providing:

a first emulsion comprising a first droplet population, wherein droplets of the first droplet population comprise a lysis reagent, and

a second emulsion comprising a second droplet population, wherein a droplet of the second droplet population comprises i) a cell or a nucleus, and ii) a plurality of nucleic acid barcode molecules;

(b) subjecting the first emulsion and second emulsion to conditions sufficient to transfer the lysis reagent to the second droplet population via micelles comprising the lysis reagent; and

(c) lysing the cell or the nucleus within the droplet of the second droplet population with the lysis reagent.

25. A method comprising:

(a) generating: 1) a first emulsion comprising a first droplet population and micelles, wherein droplets of the first droplet population and the micelles comprise a chemical lysis agent;

and 2) a second emulsion comprising a second droplet population, wherein a droplet of the second droplet population comprises: i) a cell or a nucleus comprising a target nucleic acid, and ii) a particle coupled to a plurality of nucleic acid barcode molecules;

(b) contacting the first emulsion with the second emulsion, and subjecting the first emulsion and second emulsion to conditions sufficient to transfer the chemical lysis agent to the second droplet population via the micelles comprising the chemical lysis agent; and

(c) lysing the cell or the nucleus within the droplet of the second droplet population with the chemical lysis agent, thereby releasing the target nucleic acid from the cell or the nucleus in the droplet of the second droplet population.

37.    The asserted claims of the 993 Patent are directed to concrete methods and systems for droplet-based partitioning, reagent transfer, and lysing a cell or nucleus. As the 993 Patent explains, "[c]hanging an amount of reagent in a droplet, such as increasing or decreasing the concentration, remains challenging." 993 Patent at 1:41–43. As a result, before the claimed invention, those in the art were forced to combine all the elements so they would be absorbed at the time of droplet formation—they could not combine elements into already formed droplets. The 993 Patent solves this problem through a specific combination of specific and inventive steps—

generating at least two emulsions and transferring reagents from one emulsion to another to lyse a cell or nucleus. Thus, the 993 Patent describes the following specific steps as exemplary of the invention:

> (a) providing a first emulsion comprising a first droplet population, wherein droplets of the first droplet population comprise a lysis reagent, and a second emulsion comprising a second droplet population, wherein a droplet of the second droplet population comprises i) a cell or a nucleus, and ii) a plurality of nucleic acid barcode molecules; (b) subjecting the first emulsion and second emulsion to conditions sufficient to transfer the lysis reagent to the second droplet population via micelles comprising the lysis reagent; and (c) lysing the cell or the nucleus within the droplet of the second droplet population with the lysis reagent.

*Id.* at Abstract. Additionally, the emulsions are manufactured artifacts; they are not naturally occurring or purified forms of natural products, and the recited processes involve chemical transformations, such as lysis of cells or nuclei within droplets and release of nucleic acids.

38.    The elements claimed by the 993 Patent, taken alone or in combination, were not well-understood, routine or conventional to one of ordinary skill in the art at the time of the invention. As the 993 Patent explains, using the prior art methods, it was "challenging" to "[c]hang[e] an amount of reagent in a droplet, such as increasing or decreasing the concentration." 993 Patent 1:41–43.

39.    The written description of the 993 Patent describes, in technical detail, each of the limitations in the claims, allowing a person of skill in the art to understand what those limitations cover, and therefore what was claimed. None of the elements, taken alone or in their ordered combination, were well-understood, routine, or conventional to one of ordinary skill in the art at the time of the invention. The methods covered by the claims of the 993 Patent, therefore, differ markedly from the prior systems in use at the time of this invention, which, *inter alia*, lacked these features.

40.    Dependent claims of the 993 Patent are further directed to specific, unconventional improvements to single-cell analysis. These additional unconventional improvements include, for example, contacting the two emulsions as a way of transferring the lysis reagent (claim 2); using a lysis enzyme (claim 15); and choosing a chemical lysis agent that comprises a surfactant (claim 29).

### b.    The 239 Patent

41.    Claims 1 and 29 are the only independent claims of the 239 Patent. They recite:

1. A method comprising:

(a) generating a first plurality of droplets, wherein a first droplet of the first plurality of droplets comprises a lysis agent;

(b) partitioning a plurality of cells into a second plurality of droplets, wherein a second droplet of the second plurality of droplets comprises: i) a cell of the plurality of cells, and ii) a plurality of nucleic acid barcode molecules coupled to a particle;

(c) generating a micellized lysis agent from the first droplet, wherein the micellized lysis agent comprises a micelle comprising the lysis agent;

(d) delivering the lysis agent to the second droplet using the micellized lysis agent;

(e) lysing the cell within the second droplet with the lysis agent, thereby releasing a messenger RNA (mRNA) molecule from the cell into the second droplet;

(f) hybridizing the mRNA molecule to a nucleic acid barcode molecule of the plurality of nucleic acid barcode molecules; and

(g) generating a barcoded nucleic acid molecule using the mRNA molecule and the nucleic acid barcode molecule, wherein the barcoded nucleic acid molecule comprises: i) a sequence of the mRNA molecule or a complement thereof, and ii) a sequence of the nucleic acid barcode molecule or a complement thereof.

29. A method comprising:

(a) generating a first plurality of droplets, wherein a first droplet of the first plurality of droplets comprises a lysis agent;

(b) partitioning a plurality of cells into a second plurality of droplets, wherein a

second droplet of the second plurality of droplets comprises: i) a cell of the plurality of cells, and ii) a plurality of nucleic acid barcode molecules coupled to a hydrogel bead, wherein the partitioning comprises vortexing a first fluid and a second fluid, wherein the first fluid comprises the plurality of cells and the plurality of nucleic acid barcode molecules coupled to the hydrogel bead, and wherein the second fluid is immiscible with the first fluid;

(c) generating a micellized lysis agent from the first droplet, wherein the micellized lysis agent comprises a micelle comprising the lysis agent;

(d) delivering the lysis agent to the second droplet using the micellized lysis agent;

(e) lysing the cell within the second droplet with the lysis agent, thereby releasing a messenger RNA (mRNA) molecule from the cell into the second droplet;

(f) hybridizing the mRNA molecule to a nucleic acid barcode molecule of the plurality of nucleic acid barcode molecules in the second droplet;

(g) releasing the mRNA molecule and nucleic acid barcode molecule from the second droplet; and

(h) extending the nucleic acid barcode molecule using the mRNA molecule as a template in a reverse transcription reaction to generate a barcoded nucleic acid molecule comprising: i) a sequence of the mRNA molecule or a complement thereof, and ii) a sequence of the nucleic acid barcode molecule or a complement thereof.

42.    The asserted claims of the 239 Patent are directed to concrete methods and systems for droplet-based partitioning, reagent transfer, and lysing a cell or nucleus. As the 239 Patent explains, "[c]hanging an amount of reagent in a droplet, such as increasing or decreasing the concentration, remains challenging." 239 Patent 1:41–43. As a result, before the claimed invention, those in the art were forced to combine all the elements so they would be absorbed at the time of droplet formation—they could not combine elements into already formed droplets. The 239 Patent solves this problem through a specific combination of specific and inventive steps—generating at least two emulsions and transferring reagents from one emulsion to another to lyse a cell or nucleus. Thus, the 239 Patent explains:

> The present disclosure relates to methods, compositions and systems for droplet processing. For example, a method can include (a) partitioning a plurality of cells into a plurality of aqueous droplets, wherein an aqueous droplet of the plurality of aqueous droplets comprises a cell of the plurality of cells; and delivering a micellized lysis agent to the cell in the aqueous droplet.

*Id.* Abstract. Additionally, the emulsions are manufactured artifacts; they are not naturally occurring or purified forms of natural products, and the recited processes involve chemical transformations, such as lysis of cells or nuclei within droplets and release of nucleic acids.

43.     The elements claimed by the 239 Patent, taken alone or in combination, were not well-understood, routine or conventional to one of ordinary skill in the art at the time of the invention. As the 239 Patent explains, using the prior art methods, it was "challenging" to "[c]hang[e] an amount of reagent in a droplet, such as increasing or decreasing the concentration." 239 Patent 1:41–43. As a result, before the claimed invention, those in the art were forced to combine all the elements so they would be absorbed at the time of droplet formation—they could not combine elements into already formed droplets. The 239 Patent solves this challenge by, for example:

> partitioning a plurality of cells into a plurality of aqueous droplets, wherein an aqueous droplet of the plurality of aqueous droplets comprises a cell of the plurality of cells; and delivering a micellized lysis agent to the cell in the aqueous droplet.

*Id.* Abstract.

44.     The written description of the 239 Patent describes, in technical detail, each of the limitations in the claims, allowing a person of skill in the art to understand what those limitations cover, and therefore what was claimed. None of the elements, taken alone or in their ordered combination, were well-understood, routine, or conventional to one of ordinary skill in the art at the time of the invention. The methods covered by the claims of the 239 Patent, therefore, differ markedly from the prior systems in use at the time of this invention, which, *inter alia*, lacked these features.

45.    Dependent claims of the 239 Patent are further directed to specific, unconventional improvements to single-cell analysis. These additional unconventional improvements include, for example, including a surfactant (claim 4); the partitioning includes vortexing (claim 9); and including a chemical lysis agent (claim 25).

### c.    The 102 Patent

46.    Claim 1 is the only independent claim of the 102 Patent. It recites:

1. A method for nucleic acid processing, comprising:

> (a)    generating a plurality of droplets by agitating:
>
>> (i)    a first fluid volume comprising a population of beads and a population of analyte carriers, wherein a bead of the population of beads comprises a plurality of nucleic acid barcode molecules, and wherein an analyte carrier of the population of analyte carriers comprises a plurality of nucleic acid molecules, and
>>
>> (ii)    a second fluid volume immiscible with the first fluid volume, wherein a first droplet of the plurality of droplets comprises the bead of the population of beads and the analyte carrier of the population of analyte carriers;
>
> (b)    subjecting the first droplet and a second droplet comprising a reagent to conditions sufficient to transfer the reagent to the first droplet from the second droplet via a mediator comprising an aggregate of surfactant molecules and the reagent, wherein the reagent is configured to release the plurality of nucleic acid molecules from the analyte carrier; and
>
> (c)    generating a barcoded nucleic acid molecule using a nucleic acid barcode molecule of the plurality of nucleic acid barcode molecules and a nucleic acid molecule of the plurality of nucleic acid molecules.

47.    The asserted claims of the 102 Patent are directed to concrete methods and systems for droplet generation, reagent transfer, and generation of a barcoded nucleic acid molecule. As the 102 Patent explains, "[c]hanging an amount of reagent in a droplet, such as increasing or decreasing the concentration, remains challenging." 102 Patent 1:41–43. As a result, before the claimed invention, those in the art were forced to combine all the elements so they would be

absorbed at the time of droplet formation—they could not combine elements into already formed droplets. The 102 Patent solves this problem through a specific combination of specific and inventive steps—generating a plurality of droplets by agitating immiscible fluids and transferring reagents between droplets by subjecting the first droplet and a second droplet comprising a reagent to conditions sufficient to transfer the reagent to the first droplet from the second droplet. 102 Patent at 1:59-65. The conditions include transfer of the reagent via a mediator comprising an aggregate of surfactant molecules. The 102 Patent explains:

> The disclosure provides systems and methods for droplet processing. For example, a method can include providing a first droplet and a second droplet. In some cases, the first droplet may have a first concentration of a reagent and the second droplet may have a second concentration of the reagent. The second droplet may comprise a bead or a biological particle. The method can also include subjecting the first droplet and the second droplet to conditions sufficient to transfer the reagent from the first droplet to the second droplet, thereby decreasing the first concentration in the first droplet and increasing the second concentration in the second droplet.

*Id.* Abstract.

48.    The 102 Patent discloses and claims embodiments where these conditions include the use of a mediator, thereby changing the first concentration of the reagent in the first droplet population and the second concentration of the reagent in the second droplet population.

> In some embodiments, the first fluid fraction or the second fluid fraction comprises a mediator that aids in transfer of the reagent between the first droplet population and the second droplet population. In some embodiments, in (b), the reagent is transferred between the first droplet population and the second droplet population via the mediator. In some embodiments, the mediator is derived from the first droplet population. In some embodiments, the mediator comprises a surfactant. In some embodiments, the mediator is a micelle.

*Id.* at 2:13-22.

49.    The written description of the 102 Patent describes, in technical detail, each of the limitations in the claims, allowing a person of skill in the art to understand what those limitations cover, and therefore what was claimed. None of the elements, taken alone or in their ordered

combination, were well-understood, routine, or conventional to one of ordinary skill in the art at the time of the invention. The methods covered by the claims of the 102 Patent, therefore, differ markedly from the prior systems in use at the time of this invention, which, *inter alia*, lacked these features.

50.     Dependent claims of the 102 Patent are further directed to specific, unconventional improvements to single-cell analysis. These additional unconventional improvements include, for example, generating the barcoded nucleic acid molecule by extending the nucleic acid barcode molecule in a reverse transcription reaction using the mRNA as template (claim 10); sequencing the barcoded nucleic acid molecule or a derivative thereof (claim 11); the claimed mediator is a micelle (claim 11); and the claimed first plurality of droplets are formed in a first emulsion and the claimed second plurality of droplets are formed in a second emulsion (claim 20).

## COUNT I: Infringement of the 214 Patent

51.     Plaintiffs incorporate the foregoing paragraphs of the Complaint by reference as if fully set forth herein.

52.     RSS is the sole legal owner of the 214 Patent. A true and correct copy of the assignment abstract and record of the 214 Patent is attached as **Exhibit 6**. 10x is the exclusive licensee of the 214 Patent.

53.     Illumina has directly infringed and continues to directly infringe one or more claims of the 214 Patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by performing in the United States without authority each step of the claimed methods in conjunction with the Accused Instrumentalities and/or components thereof. **Attachment A** provides an exemplary infringement claim chart for one asserted claim of the 214 Patent and exemplary and/or representative Accused Instrumentalities.

54.     Illumina is and has been aware of the 214 Patent and that the conduct identified herein would result in the infringement of one or more claims of the 214 Patent. Illumina has been aware of the 214 Patent and its infringement at least since October 20, 2025, when 10x notified Illumina by letter of the 214 Patent and its infringement, and at least since the filing and service of this Complaint. On information and belief Illumina was aware of the patent family containing the 214 and 902 Patents through Illumina's work on Sci-seq and interactions with Scale Biosciences, who had exclusively licensed the Nolan patent family from Roche. Illumina personnel, including those in Illumina's legal department, were aware of the Nolan patents during Illumina's collaboration on Sci-seq. On information and belief Illumina actively monitored the Nolan patent family and cited it during prosecution of Illumina patent applications, including BR112017017025B1 and the application leading to U.S. Patent No. 11,634,707.

55.     Illumina has actively induced and continues to actively induce infringement, literally or under the doctrine of equivalents, of one or more claims of the 214 Patent under 35 U.S.C. § 271(b) by making and selling the Accused Instrumentalities and/or components thereof in the United States and intentionally instructing or otherwise encouraging others, including Illumina's customers and/or end users such as scientists working in laboratories that purchase the Accused Instrumentalities and/or components thereof, to use the Accused Instrumentalities and/or components thereof in the United States in a manner that infringes one or more claims of the 214 Patent. On information and belief, Illumina provided this instruction and encouragement to its actual and prospective customers and/or end users with the knowledge and intent that doing so would result in the infringement of one or more claims of the 214 Patent by those customers and/or end users. One or more of Illumina's customers and/or end users of the Accused Instrumentalities and/or components thereof have directly infringed and continue to

directly infringe one or more claims of the 214 Patent by using the Accused Instrumentalities and/or components thereof in accordance with Illumina's instructions and encouragement. Illumina has committed and continues to commit these acts of infringement without license or authorization. Discovery is expected to show further how Illumina's customers and/or end users perform the claimed steps of the 214 Patent in conjunction with Illumina's products.

56.     Illumina has contributed and continues to contribute to the infringement of one or more claims of the 214 Patent under 35 U.S.C. § 271(c) by selling and/or offering to sell the Accused Instrumentalities and/or components thereof within the United States for use by its customers and/or end users knowing that the Accused Instrumentalities and/or components thereof are especially made or especially adapted for use in a manner that infringes one or more claims of the 214 Patent and are not a staple article or commodity of commerce suitable for substantial non-infringing use. As a result of Illumina's selling and/or offering for sale of the Accused Instrumentalities and/or components thereof, other entities, on information and belief, use these products for their intended purpose and according to Illumina's instructions with the result that such entities, such as Illumina's customers and/or end users of the Accused Instrumentalities and/or components thereof, directly infringe the asserted claims of the 214 Patent, literally or under the doctrine of equivalents. Illumina has committed and continues to commit these acts of infringement without license or authorization.

57.     Plaintiffs have suffered and continue to suffer damages because of Illumina's infringement of the 214 Patent.

58.     The infringement of the 214 Patent by Illumina has been willful and deliberate, and continues to be willful and deliberate. At least as of October 20, 2025, if not earlier, Illumina knew or should have known that its actions did and would constitute an unjustifiably high risk of

infringement of the 214 Patent. Such conduct constitutes, at minimum, willful infringement of the 214 Patent, justifying an award of treble damages pursuant to 35 U.S.C. § 284.

59.    Unless Illumina is enjoined from infringing the 214 Patent, Illumina's efforts to design, develop, make, market, offer to sell, and sell the Accused Instrumentalities and/or components thereof will cause Plaintiffs to suffer irreparable injury for which damages are an inadequate remedy.

## COUNT II: Infringement of the 902 Patent

60.    Plaintiffs incorporate the foregoing paragraphs of the Complaint by reference as if fully set forth herein.

61.    RSS is the sole legal owner of the 902 Patent. A true and correct copy of the assignment abstract and record of the 902 Patent is attached as **Exhibit 7**. 10x is the exclusive licensee of the 902 Patent.

62.    Illumina has directly infringed and continues to directly infringe one or more claims of the 902 Patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by performing in the United States without authority each step of the claimed methods in conjunction with the Accused Instrumentalities and/or components thereof. **Attachment B** provides an exemplary infringement claim chart for one asserted claim of the 902 Patent and exemplary and/or representative Accused Instrumentalities.

63.    Discovery is expected to show how Illumina, its customers, and/or its end users perform the claimed steps of the 902 Patent in conjunction with the Accused Instrumentalities.

64.    Illumina is and has been aware of the 902 Patent and that the conduct identified herein would result in the infringement of one or more claims of the 902 Patent. Illumina has been aware of the 902 Patent and its infringement at least since October 20, 2025, when 10x notified Illumina by letter of the 902 Patent and its infringement, and at least since the filing and service of

this Complaint. On information and belief Illumina was aware of the patent family containing the 214 and 902 Patents through Illumina's work on Sci-seq and interactions with Scale Biosciences, who had exclusively licensed the Nolan patent family from Roche. Illumina personnel, including those in Illumina's legal department, were aware of the Nolan patents during Illumina's collaboration on Sci-seq. On information and belief Illumina actively monitored the Nolan patent family and cited it during prosecution of Illumina patent applications, including BR112017017025B1 and the application leading to U.S. Patent No. 11,634,707.

65.    Illumina has actively induced and continues to actively induce infringement, literally or under the doctrine of equivalents, of one or more claims of the 902 Patent under 35 U.S.C. § 271(b) by making and selling the Accused Instrumentalities and/or components thereof in the United States and intentionally instructing or otherwise encouraging others, including Illumina's customers and/or end users such as scientists working in laboratories that purchase the Accused Instrumentalities and/or components thereof, to use the Accused Instrumentalities and/or components thereof in the United States in a manner that infringes one or more claims of the 902 Patent. On information and belief, Illumina provided this instruction and encouragement to its actual and prospective customers and/or end users with the knowledge and intent that doing so would result in the infringement of one or more claims of the 902 Patent by those customers and/or end users. One or more of Illumina's customers and/or end users of the Accused Instrumentalities and/or components thereof have directly infringed and continue to directly infringe one or more claims of the 902 Patent by using the Accused Instrumentalities and/or components thereof in accordance with Illumina's instructions and encouragement. Illumina has committed and continues to commit these acts of infringement without license or

authorization. Discovery is expected to show further how Illumina's customers and/or end users perform the claimed steps of the 902 Patent in conjunction with Illumina's products.

66.     Illumina has contributed and continues to contribute to the infringement of one or more claims of the 902 Patent under 35 U.S.C. § 271(c) by selling and/or offering to sell the Accused Instrumentalities and/or components thereof within the United States for use by its customers and/or end users knowing that the Accused Instrumentalities and/or components thereof are especially made or especially adapted for use in a manner that infringes one or more claims of the 902 Patent and are not a staple article or commodity of commerce suitable for substantial non-infringing use. As a result of Illumina's selling and/or offering for sale of the Accused Instrumentalities and/or components thereof, other entities, on information and belief, use these products for their intended purpose and according to Illumina's instructions with the result that such entities, such as Illumina's customers and/or end users of the Accused Instrumentalities and/or components thereof, directly infringe the asserted claims of the 902 Patent, literally or under the doctrine of equivalents. Illumina has committed and continues to commit these acts of infringement without license or authorization.

67.     Plaintiffs have suffered and continue to suffer damages because of Illumina's infringement of the 902 Patent.

68.     The infringement of the 902 Patent by Illumina has been willful and deliberate, and continues to be willful and deliberate. At least as of October 20, 2025, if not earlier, Illumina knew or should have known that its actions did and would constitute an unjustifiably high risk of infringement of the 902 Patent. Such conduct constitutes, at minimum, willful infringement of the 902 Patent, justifying an award of treble damages pursuant to 35 U.S.C. § 284.

69.    Unless Illumina is enjoined from infringing the 902 Patent, Illumina's efforts to design, develop, make, market, offer to sell, and sell the Accused Instrumentalities and/or components thereof will cause Plaintiffs to suffer irreparable injury for which damages are an inadequate remedy.

## COUNT III: Infringement of the 993 Patent

70.    Plaintiffs incorporate the foregoing paragraphs of the Complaint by reference as if fully set forth herein.

71.    10x is the sole legal owner of the 993 Patent. A true and correct copy of the assignment abstract and record of the 993 Patent is attached as **Exhibit 8**.

72.    Illumina is and has been aware of the 993 Patent and that the conduct identified herein would result in the infringement of one or more claims of the 993 Patent. *First,* Illumina has been aware of the 993 Patent and its infringement at least since October 20, 2025, when 10x notified Illumina by letter of the 993 Patent and its infringement, and at least since the filing and service of this Complaint. *Second*, Illumina is the co-owner of U.S. Patent No. 11,739,372, which lists the 862 publication (an ancestor of the 993 Patent) on its face. On information and belief, Illumina monitors relevant patents and, given that it was aware of the 993 Patent's family, it is aware of the existence of the 993 Patent and the scope of its claims.

73.    Illumina has actively induced and continues to actively induce infringement, literally or under the doctrine of equivalents, of one or more claims of the 993 Patent under 35 U.S.C. § 271(b) by making and selling the Accused Instrumentalities and/or components thereof in the United States and intentionally instructing or otherwise encouraging others, including Illumina's customers and/or end users such as scientists working in laboratories that purchase the Accused Instrumentalities and/or components thereof, to use the Accused Instrumentalities and/or components thereof in the United States in a manner that infringes one or

more claims of the 993 Patent. **Attachment C** provides an exemplary infringement claim chart for one asserted claim of the 993 Patent and exemplary and/or representative Accused Instrumentalities. On information and belief, Illumina provided this instruction and encouragement to its actual and prospective customers and/or end users with the knowledge and intent that doing so would result in the infringement of one or more claims of the 993 Patent by those customers and/or end users. One or more of Illumina's customers and/or end users of the Accused Instrumentalities and/or components thereof have directly infringed and continue to directly infringe one or more claims of the 993 Patent by using the Accused Instrumentalities and/or components thereof in accordance with Illumina's instructions and encouragement. Illumina has committed and continues to commit these acts of infringement without license or authorization. Discovery is expected to show further how Illumina's customers and/or end users perform the claimed steps of the 993 Patent in conjunction with Illumina's products.

74.     Illumina has contributed and continues to contribute to the infringement of one or more claims of the 993 Patent under 35 U.S.C. § 271(c) by selling and/or offering to sell the Accused Instrumentalities and/or components thereof within the United States for use by its customers and/or end users knowing that the Accused Instrumentalities and/or components thereof are especially made or especially adapted for use in a manner that infringes one or more claims of the 993 Patent and are not a staple article or commodity of commerce suitable for substantial non-infringing use. As a result of Illumina's selling and/or offering for sale of the Accused Instrumentalities and/or components thereof, other entities, on information and belief, use these products for their intended purpose and according to Illumina's instructions with the result that such entities, such as Illumina's customers and/or end users of the Accused Instrumentalities and/or components thereof, directly infringe the asserted claims of the 993 Patent, literally or under

the doctrine of equivalents. Illumina has committed and continues to commit these acts of infringement without license or authorization.

75.     Plaintiffs have suffered and continue to suffer damages because of Illumina's infringement of the 993 Patent.

76.     The infringement of the 993 Patent by Illumina has been willful and deliberate, and continues to be willful and deliberate. At least as of October 20, 2025, if not earlier, Illumina knew or should have known that its actions did and would constitute an unjustifiably high risk of infringement of the 993 Patent. Such conduct constitutes, at minimum, willful infringement of the 993 Patent, justifying an award of treble damages pursuant to 35 U.S.C. § 284.

77.     Unless Illumina is enjoined from infringing the 993 Patent, Illumina's efforts to design, develop, make, market, offer to sell, and sell the Accused Instrumentalities and/or components thereof will cause Plaintiffs to suffer irreparable injury for which damages are an inadequate remedy.

## COUNT IV: Infringement of the 239 Patent

78.     Plaintiffs incorporate the foregoing paragraphs of the Complaint by reference as if fully set forth herein.

79.     10x is the sole legal owner of the 239 Patent. A true and correct copy of the assignment abstract and record of the 239 Patent is attached as **Exhibit 9**.

80.     Illumina is and has been aware of the 239 Patent and that the conduct identified herein would result in the infringement of one or more claims of the 239 Patent. First, Illumina has been aware of the 239 Patent and its infringement at least since October 20, 2025, when 10x notified Illumina by letter of the 239 Patent and its infringement, and at least since the filing and service of this Complaint. Second, Illumina is the co-owner of U.S. Patent No. 11,739,372, which lists the 862 publication (an ancestor of the 239 Patent) on its face. On information and belief,

Illumina monitors relevant patents and, given that it was aware of the 239 Patent's family, it is aware of the existence of the 239 Patent and the scope of its claims.

81.    Illumina has actively induced and continues to actively induce infringement, literally or under the doctrine of equivalents, of one or more claims of the 239 Patent under 35 U.S.C. § 271(b) by making and selling the Accused Instrumentalities and/or components thereof in the United States and intentionally instructing or otherwise encouraging others, including Illumina's customers and/or end users such as scientists working in laboratories that purchase the Accused Instrumentalities and/or components thereof, to use the Accused Instrumentalities and/or components thereof in the United States in a manner that infringes one or more claims of the 239 Patent. **Attachment D** provides an exemplary infringement claim chart for one asserted claim of the 239 Patent and exemplary and/or representative Accused Instrumentalities. On information and belief, Illumina provided this instruction and encouragement to its actual and prospective customers and/or end users with the knowledge and intent that doing so would result in the infringement of one or more claims of the 239 Patent by those customers and/or end users. One or more of Illumina's customers and/or end users of the Accused Instrumentalities and/or components thereof have directly infringed and continue to directly infringe one or more claims of the 239 Patent by using the Accused Instrumentalities and/or components thereof in accordance with Illumina's instructions and encouragement. Illumina has committed and continues to commit these acts of infringement without license or authorization. Discovery is expected to show further how Illumina's customers and/or end users perform the claimed steps of the 239 Patent in conjunction with Illumina's products.

82.    Illumina has contributed and continues to contribute to the infringement of one or more claims of the 239 Patent under 35 U.S.C. § 271(c) by selling and/or offering to sell the

Accused Instrumentalities and/or components thereof within the United States for use by its customers and/or end users knowing that the Accused Instrumentalities and/or components thereof are especially made or especially adapted for use in a manner that infringes one or more claims of the 239 Patent and are not a staple article or commodity of commerce suitable for substantial non-infringing use. As a result of Illumina's selling and/or offering for sale of the Accused Instrumentalities and/or components thereof, other entities, on information and belief, use these products for their intended purpose and according to Illumina's instructions with the result that such entities, such as Illumina's customers and/or end users of the Accused Instrumentalities and/or components thereof, directly infringe the asserted claims of the 239 Patent, literally or under the doctrine of equivalents. Illumina has committed and continues to commit these acts of infringement without license or authorization.

83.    Plaintiffs have suffered and continue to suffer damages because of Illumina's infringement of the 239 Patent.

84.    The infringement of the 239 Patent by Illumina has been willful and deliberate, and continues to be willful and deliberate. At least as of October 20, 2025, if not earlier, Illumina knew or should have known that its actions did and would constitute an unjustifiably high risk of infringement of the 239 Patent. Such conduct constitutes, at minimum, willful infringement of the 239 Patent, justifying an award of treble damages pursuant to 35 U.S.C. § 284.

85.    Unless Illumina is enjoined from infringing the 239 Patent, Illumina's efforts to design, develop, make, market, offer to sell, and sell the Accused Instrumentalities and/or components thereof will cause Plaintiffs to suffer irreparable injury for which damages are an inadequate remedy.

**COUNT V: Infringement of the 102 Patent**

86.     Plaintiffs incorporate the foregoing paragraphs of the Complaint by reference as if fully set forth herein.

87.     10x is the sole legal owner of the 102 Patent. A true and correct copy of the assignment abstract and record of the 102 Patent is attached as **Exhibit 10**.

88.     Illumina is and has been aware of the 102 Patent and that the conduct identified herein would result in the infringement of one or more claims of the 102 Patent. *First*, Illumina has been aware of the 102 Patent and its infringement at least since October 20, 2025, when 10x notified Illumina by letter of the 102 Patent and its infringement, and at least since the filing and service of this Complaint. *Second*, Illumina is the co-owner of U.S. Patent No. 11,739,372, which lists the 862 publication (an ancestor of the 102 Patent) on its face. On information and belief, Illumina monitors relevant patents and, given that it was aware of the 102 Patent's family, it is aware of the existence of the 102 Patent and the scope of its claims.

89.     Illumina has actively induced and continues to actively induce infringement, literally or under the doctrine of equivalents, of one or more claims of the 102 Patent under 35 U.S.C. § 271(b) by making and selling the Accused Instrumentalities and/or components thereof in the United States and intentionally instructing or otherwise encouraging others, including Illumina's customers and/or end users such as scientists working in laboratories that purchase the Accused Instrumentalities and/or components thereof, to use the Accused Instrumentalities and/or components thereof in the United States in a manner that infringes one or more claims of the 102 Patent. **Attachment E** provides an exemplary infringement claim chart for one asserted claim of the 102 Patent and exemplary and/or representative Accused Instrumentalities. On information and belief, Illumina provided this instruction and encouragement to its actual and prospective customers and/or end users with the knowledge and intent that doing so would result in the

34

infringement of one or more claims of the 102 Patent by those customers and/or end users. One or more of Illumina's customers and/or end users of the Accused Instrumentalities and/or components thereof have directly infringed and continue to directly infringe one or more claims of the 102 Patent by using the Accused Instrumentalities and/or components thereof in accordance with Illumina's instructions and encouragement. Illumina has committed and continues to commit these acts of infringement without license or authorization. Discovery is expected to show further how Illumina's customers and/or end users perform the claimed steps of the 102 Patent in conjunction with Illumina's products.

90.    Illumina has contributed and continues to contribute to the infringement of one or more claims of the 102 Patent under 35 U.S.C. § 271(c) by selling and/or offering to sell the Accused Instrumentalities and/or components thereof within the United States for use by its customers and/or end users knowing that the Accused Instrumentalities and/or components thereof are especially made or especially adapted for use in a manner that infringes one or more claims of the 102 Patent and are not a staple article or commodity of commerce suitable for substantial non-infringing use. As a result of Illumina's selling and/or offering for sale of the Accused Instrumentalities and/or components thereof, other entities, on information and belief, use these products for their intended purpose and according to Illumina's instructions with the result that such entities, such as Illumina's customers and/or end users of the Accused Instrumentalities and/or components thereof, directly infringe the asserted claims of the 102 Patent, literally or under the doctrine of equivalents. Illumina has committed and continues to commit these acts of infringement without license or authorization.

91.    Plaintiffs have suffered and continue to suffer damages because of Illumina's infringement of the 102 Patent.

92.    The infringement of the 102 Patent by Illumina has been willful and deliberate, and continues to be willful and deliberate. At least as of October 20, 2025, if not earlier, Illumina knew or should have known that its actions did and would constitute an unjustifiably high risk of infringement of the 102 Patent. Such conduct constitutes, at minimum, willful infringement of the 102 Patent, justifying an award of treble damages pursuant to 35 U.S.C. § 284.

93.    Unless Illumina is enjoined from infringing the 102 Patent, Illumina's efforts to design, develop, make, market, offer to sell, and sell the Accused Instrumentalities and/or components thereof will cause Plaintiffs to suffer irreparable injury for which damages are an inadequate remedy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter the following relief in its favor and against Illumina:

A.    For entry of judgment that the Asserted Patents have been and continue to be indirectly infringed by Illumina, either literally or under the doctrine of equivalents;

B.    For entry of judgment that Illumina's infringement has been willful and deliberate;

C.    For a declaration that each of the Asserted Patents is valid and enforceable;

D.    For permanent injunctions enjoining the aforesaid acts of infringement by Illumina, its officers, agents, servants, employees, attorneys, parent and subsidiary entities, assigns and successors in interest, and those persons acting in concert with them, including related individuals and entities, customers, representatives, distributors, dealers, and end users. In the alternative, if the Court finds that an injunction is not warranted, Plaintiffs request an award of post-judgment royalty to compensate for future infringement;

E.  An award of all monetary relief adequate to compensate for damages resulting from Illumina's infringement, including lost profits but in no event less than a reasonable royalty under 35 U.S.C. § 284 for Illumina's infringement, including all pre-judgment and post-judgment interest at the maximum rate allowed by law, and damages for willful infringement;

F.  A declaration that the case is an exceptional case and that Illumina be required to pay Plaintiffs' attorneys' fees pursuant to 35 U.S.C. § 285; and

G.  A judgment awarding Plaintiffs such other and further relief as the Court may deem just, reasonable, and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial on all issues so triable.

OF COUNSEL:
Matthew Powers
Paul Ehrlich
William Nelson
TENSEGRITY LAW GROUP LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
(650) 802-6000

Azra Hadzimehmedovic
Daniel Kazhdan
Kiley White
TENSEGRITY LAW GROUP LLP
1676 International Dr., Suite 910
McLean, VA 22102
(650) 802-6000

*Attorneys for 10x Genomics, Inc.*

/s/ Karen E. Keller
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Plaintiffs 10x Genomics, Inc.*
*and Roche Sequencing Solutions, Inc.*

Robert J. Gunther Jr.
Christopher R. Noyes
WILMER CUTLER PICKERING HALE & DORR LLP
7 World Trade Center
250 Greenwich Center
New York, NY 10007
(212) 230-8800

*Attorneys for Roche Sequencing Solutions, Inc.*

Dated: October 21, 2025